IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

DAVID WILLIAMS,

       Plaintiff,

vs.

WISCONSIN DEPARTMENT OF CORRECTIONS; and
TIMOTHY THOMAS, DAN HUNEKE, ERIC PETERS,
LARRY FUCHS, and ROSLYN HUNEKE, IN THEIR
INDIVIDUAL AND OFFICIAL CAPACITIES.

       Defendants.

Civil Action No. 19-cv-681
(Trial by Jury Demanded)

## AMENDED COMPLAINT

### INTRODUCTION

1.    Plaintiff David Williams, an inmate with a visual disability at the New Lisbon Correctional Institution in New Lisbon, Wisconsin, brings this lawsuit under the Americans with Disabilities Act (ADA), 42 U.S.C. § 12188, the Rehabilitation Act (Rehab Act), 29 U.S.C. § 794a., and the Civil Rights Act of 1871, 42 U.S.C. § 1983.

2.    He argues that the Defendants, acting in their official capacity, are failing to accommodate his disability by housing him in a dual-occupancy cell, which poses a known risk of complete blindness to him and the damage or loss of various ADA approved electronic equipment that he necessarily relies upon on a daily basis to aid his sight and participate in institutional programming and services.

3.    He additionally argues that the individual Defendants—but not the Department of Corrections—are violating his rights under the Eighth Amendment

insofar as they are acting with deliberate indifference in refusing to house him in a single-occupancy cell despite knowing—based on the documented advice of his medical providers—that his being housed in a dual-occupancy cell poses the risk of trauma to his head that likely would result in complete blindness.

4.      Plaintiff Williams seeks declaratory relief, pursuant to 28 U.S.C. § 2201(a), that the Defendants are violating his rights under the ADA, Rehab Act, and Civil Rights Act.

5.      Additionally, he seeks damages in compensation for the injuries caused by the individual Defendants' unlawful conduct and punitive damages for the malicious or wanton violation of his constitutional rights, as well any attorneys' fees to which he may be entitled.

## JURISDICTION AND VENUE

**Jurisdiction**

6.      Jurisdiction over the subject matter of this action is conferred by 28 U.S.C. §§ 1331, 1343(a)(3)-(4).

**Venue**

7.      Venue is properly laid in the Western District of Wisconsin because a substantial part of the events giving rise to the claim occurred in Juneau County, within the Western District of Wisconsin. 28 U.S.C. § 1391(b)(2).

## PARTIES

**Plaintiff**

8.     Plaintiff David Williams is an adult citizen of the United States and a resident of the State of Wisconsin. Presently and at all times relevant to this action, Plaintiff Williams has been an inmate at New Lisbon Correctional Institution (NLCI) in New Lisbon, Wisconsin. Plaintiff Williams' mailing address is Post Office Box 4000, New Lisbon, Wisconsin 53950.

**Defendants**

9.     Defendant Wisconsin Department of Corrections (DOC) is a public agency of the State of Wisconsin and is responsible for the operation of the State's prisons, including NLCI. Defendant DOC's mailing address is 3099 East Washington Avenue, Madison, Wisconsin 53704. Defendant DOC is sued for violations of the ADA and Rehab Act. It is not sued for violating Plaintiff Williams' constitutional rights under the Civil Rights Act.

10.     Defendant Timothy Thomas is an adult citizen of the United States and a resident of the State of Wisconsin. At all times relevant to this lawsuit, Defendant Thomas was the Deputy Warden at NLCI. His business address is 2000 Progress Road, New Lisbon, Wisconsin 53950. Defendant Thomas is sued in his official capacity for violations of the ADA and Rehab Act. He is sued in his individual capacity for monetary damages resultant from the violations of Plaintiff Williams' various rights for which he is liable.

11.     Defendant Dan Huneke is an adult citizen of the United States and a resident of the State of Wisconsin. At all times relevant to this lawsuit, Defendant D.

Huenke was the PSU Supervisor at NLCI. His business address is 2000 Progress Road, New Lisbon, Wisconsin 53950. Defendant D. Huneke is sued in his official capacity for violations of the ADA and Rehab Act. He is sued in his individual capacity for monetary damages resultant from the violations of Plaintiff Williams' various rights for which he is liable.

12.     Defendant Eric Peters is an adult citizen of the United States and a resident of the State of Wisconsin. At all times relevant to this lawsuit, Defendant Peters was the unit supervisor of Plaintiff Williams' unit at NLCI. His business address is 2000 Progress Road, New Lisbon, Wisconsin 53950. Defendant Peters is sued in his official capacity for violations of the ADA and Rehab Act. He is sued in his individual capacity for monetary damages resultant from the violations of Plaintiff Williams' various rights for which he is liable.

13.     Defendant Larry Fuchs is an adult citizen of the United States and a resident of the State of Wisconsin. At all times relevant to this lawsuit, Defendant Fuchs was the Security Director at NLCI. His business address is 2000 Progress Road, New Lisbon, Wisconsin 53950. Defendant Fuchs is sued in his official capacity for violations of the ADA and Rehab Act. He is sued in his individual capacity for monetary damages resultant from the violations of Plaintiff Williams' various rights for which he is liable.

14.     Defendant Roslyn Huneke is an adult citizen of the United States and a resident of the State of Wisconsin. At all times relevant to this lawsuit, Defendant R. Huneke was the HSU supervisor at NLCI. Her business address is 2000 Progress Road, New Lisbon, Wisconsin 53950. Defendant R. Huneke is sued in her official capacity for

violations of the ADA and Rehab Act. She is sued in her individual capacity for monetary damages resultant from the violations of Plaintiff Williams' various rights for which she is liable.

15.    All actions alleged in this complaint to have been undertaken by the individual defendants named above were done under the color of state law, within the meaning of 42 U.S.C. § 1983, and while carrying out their duties as a public officer or employee and within the scope of their employment, within the meaning of Wis. Stat. § 895.46, during the relevant time period.

## ALLEGATIONS OF FACT AS TO ALL CAUSES OF ACTION

**A.    Plaintiff Williams' disability and the video magnifiers he uses to compensate for it so that he can access institutional services and participate in institutional programming**

16.    Plaintiff Williams is visually impaired to the point of legal blindness.

17.    His left eye is prosthetic; his right eye has no lens, a non-dilating pupil, and offers extremely poor peripheral vision.

18.    Plaintiff Williams' medical providers have consistently and repeatedly informed him that trauma to his head could result in the detachment of his retina, causing permanent blindness. Those same medical providers have told Plaintiff Williams that he absolutely cannot get hit in the head and must take all possible steps to avoid it.

19.    Plaintiff Williams was born with offset lenses and slight retinal detachment. His vison—specifically his visual acuity and visual field—has deteriorated over his life and continues to deteriorate during his time at NLCI.

20.     Plaintiff Williams does not read brail, having never learned because he could previously see well enough to read visually.

21.     At this time, Plaintiff Williams vision has deteriorated to the point that he must use electronic devices to accommodate reading and writing. For that purpose, he has been approved to have and use at NLCI both a fifteen-inch desktop video magnifier and a smaller, handheld seven-inch video magnifier.

22.     Additionally, due to his limited sight, Williams is ADA approved to have and use a larger television in his cell.

23.     During the period of Plaintiff Williams' incarceration, he has earned three advanced degrees: a Doctorate of Theology (Th.D.), a Doctorate of Christian Education (D.C.E.), and a doctorate in Clinical Counseling (Ph.D.), the coursework for which required substantial amounts of reading and writing.

24.     Additionally during his incarceration, Plaintiff Williams has worked in clerical jobs, tutoring, and teaching chapel programs, all of which required substantial amounts of reading and writing.

25.     Due to the deterioration of Plaintiff Williams' vision, he can no longer participate in educational programming, assessed institutional programming, clerical jobs, tutoring, or teaching chapel without use of his video magnifiers.

26.     Additionally, without his video magnifiers, Plaintiff Williams cannot read such things as: (1) posted notices at NLCI; (2) legal correspondence; (3) literature in the NLCI law library; (4) standard NLCI forms or responses thereto including, but not limited to, inmate complaint forms; (5) institutional signage; (6) the text on the wall kiosk

that is used to communicate with institutional staff; (7) personal mail; and (8) the spines and content of books in the library.

27.     Plaintiff Williams is prescribed and uses various medications—including approximately seven different kinds of eye drops and blood pressure medication—the containers for which he cannot read without using his video magnifiers.

28.     Without his video magnifiers, Plaintiff Williams is unable to complete the forms required to obtain medical treatment (HSU forms), including refills of his prescription medication; he likewise cannot read any responses thereto by the HSU.

29.     Without his video magnifiers, Plaintiff Williams is unable to complete the institution's ADA reasonable accommodation forms; he likewise cannot read any responses thereto by the ADA coordinator.

30.     Plaintiff Williams relies on his video magnifiers to read the catalogs from which he is required to order property or canteen, and thus, without those magnifiers, he cannot order property or canteen.

31.     Plaintiff Williams' video magnifiers cost him approximately $4,000.00 to purchase, and he is responsible for paying for any costs required to service those items.

32.     NLCI cannot service Plaintiff Williams' video magnifiers if damaged; servicing requires that the magnifiers be shipped off site. When the video magnifiers must be sent for servicing, Plaintiff Williams does not have a backup; he has only one of each magnifier. Previously, when Plaintiff Williams sent one of his video magnifiers in for servicing, he was without it for several weeks.

33.     Both video magnifiers are fragile electronic devices that include a camera and a video screen.

34.     Neither video magnifier is waterproof, making them subject to damage if liquid is spilled on them.

35.     Both video magnifiers are battery powered and must be charged by plugging their associated power cords into an outlet. Charging each magnifier takes approximately 2.5 hours and must be done two to three times per day. When the magnifiers are plugged in, excessive force on the power cable risks damage to the charging port or the charger, possibly rendering the device unchargeable and thus inoperable.

36.     Plaintiff Williams' fifteen-inch magnifier is portable but designed to remain open on a flat surface, such as a desk; it is not designed to be frequently put up and taken down.

37.     When collapsed, Plaintiff Williams' fifteen-inch magnifier is designed to lay flat; it is not designed to remain standing on its side. Storing it on its side risks that it will fall, which could damage it.

38.     All the Defendants to this lawsuit are aware of Plaintiff Williams' visual impairment and disability, as well as the danger that trauma to his head could cause permanent blindness.

39.     All of the Defendants to this lawsuit are aware that Plaintiff Williams uses ADA approved video magnifiers to aid his sight.

**B.    The dangers to Plaintiff Williams and his ADA equipment in a dual-occupancy cell**

40.    Plaintiff Williams' dual-occupancy cell at NLCI is a cramped space.

41.    The small room includes bunk beds, a desk, a storage cabinet, two chairs, and a toilet (Williams is on a wet-cell restriction to accommodate his disability).

42.    There is very little free space on the floor.

**i.    Danger to Williams**

43.    Due to his disability, Plaintiff Williams sleeps in the lower bunk, which creates a hazard. Namely, because of the upper bunk, Plaintiff Williams is at risk of hitting and does hit his head when getting in and out of bed, as well as when sitting up in bed.

44.    Additionally, Plaintiff Williams is exposed to trip hazards in the cramped confines of his dual-occupancy cell.

45.    One of the chairs in the cell is usually pushed under the desk; the second chair sits next to the desk and its legs protrude into the main area of the cell. Plaintiff Williams repeatedly kicks the legs of the second chair when moving around the cramped confines of his dual-occupancy cell, including to use the in-cell toilet, causing a trip hazard that could result in his falling and hitting his head.

46.    In his dual-occupancy cell, Plaintiff Williams' cellmate is allowed to have a floor rug for religious purposes. That rug creates a trip hazard because it is not affixed to the ground, can be moved, and Plaintiff Williams is unable to see it.

47.     In his dual-occupancy cell, Plaintiff Williams can trip over his cellmate's shoes, which are left on the floor in inconsistent locations; there is no other storage space for his cellmate's shoes.

48.     In his dual-occupancy cell, Plaintiff Williams must set his video magnifiers on his lower bunk to charge them. The outlet is across the room from the bunk. Thus, when Plaintiff Williams is charging his video magnifiers, the power cord stretches across the room, creating a trip hazard for both he and his cellmate.

49.     In addition to trip hazards, the cramped nature of Plaintiff Williams' dual-occupancy cell causes a danger that he will collide with his cellmate, which occurs with some frequency.

50.     Plaintiff Williams is presently housed on NLCI's C-Unit. This year—after twenty-one months of filing complaints, requesting for reasonable accommodation, speaking with staff, and the involvement of DOC legal counsel—the lights on that unit were changed specifically to accommodate Plaintiff Williams' disability.

51.     NLCI's C-Unit is also a transitional unit; it serves as a transition point for inmates who are returning to the general population from segregation or after arriving at NLCI.

52.     Twice in 2018, two different inmates were celled with Plaintiff Williams who had just ended segregation terms after having physically attacked their prior cellmate.

53.     Because of Plaintiff Williams' disability, he must leave the overhead light on at all times other than during lights out; otherwise, he cannot see things in his cell.

That overhead light shines directly in the face of the person on to the top bunk, which in Plaintiff Williams' case is always his cellmate.

54.    It is not unusual for the inmate with whom Plaintiff Williams is celled to become aggrieved at his need for the overhead light to be constantly illuminated. This often causes problems, including threats against Plaintiff Williams and his video magnifiers.

### ii.    Danger to Williams' ADA equipment

55.    In a dual-occupancy cell, there is no place for Plaintiff Williams to keep his fifteen-inch magnifier open and safe from damage.

56.    Plaintiff Williams cannot set the magnifier up on the desk because his ADA approved television must sit on the desk and takes up the entire space (the television is too large to fit in the cabinet space otherwise provided for standard-sized televisions).

57.    To use his fifteen-inch magnifier, Williams must put it up on his lower bunk when using it, and then take it down afterward.

58.    The repeated assembling and collapsing of Plaintiff Williams' fifteen-inch magnifier is causing wear and tear; parts are loosening, and the magnifier will likely soon require servicing if not be permanently damaged.

59.    Additionally, when the magnifier is collapsed and stored, the only place for it to be stored is on its side in the cabinet, exposing the magnifier to damage if it fell over or out of the cabinet.

60.    As mentioned before, the power cord must stretch across the room to accommodate charging Plaintiff Williams' video magnifiers. If Plaintiff Williams or his

cellmate were to trip on the cord during charging, the video magnifier could be damaged and become inoperable.

61.     Also, as mentioned before, Plaintiff Williams' need for the cell's overhead light to be on throughout the day has caused previous cellmates to retaliate by threatening damage to or destruction of his video magnifiers.

62.     Once, while Plaintiff Williams was on his lower bunk using his magnifier, his cellmate spilled a bowl of cereal from the upper bunk and onto Plaintiff Williams' magnifier.

**C.      What a single-occupancy cell would provide Williams**

63.     A single-occupancy cell has only one bed; there is no upper bunk hanging over it, and thus Plaintiff Williams would not be at risk of banging his head into the upper bunk when getting in or out of bed or sitting up in it.

64.     If Plaintiff Williams were in a single-occupancy cell, he could keep the floor clear of clutter or other hazards that might cause him to trip and fall, and there would be no second chair with legs protruding into the walk-space.

65.     If Plaintiff Williams were in a single-occupancy cell, he would not have to be concerned about colliding with his cellmate, risking trauma to his head.

66.     If Plaintiff Williams were in a single-occupancy cell, he could place his video magnifiers in the cabinet along the same wall as the outlet to charge them; there would be no power cord stretched across the cell to reach the outlet.

67.     If Plaintiff Williams were in a single-occupancy cell, he could leave his fifteen-inch video magnifier set up in the cabinet; he would not have to constantly assemble and disassemble it.

68.     If Plaintiff Williams were in single-occupancy cell, he would not be exposed to the risk of being housed with inmates who have physically assaulted prior cellmates but are transitioning back into the general population.

69.     If Plaintiff Williams were in a single-occupancy cell, he would not have to be concerned with retaliatory acts against him or his property by his cellmate for either the accidental interference with his cellmate's person or property or the constant illumination of the cell's overhead lighting.

**D.     A history of Plaintiff Williams' attempts to be placed in a single-occupancy cell at NLCI**

70.     Plaintiff Williams arrived at NLCI on June 20, 2017, he has thereafter been continuously housed in a dual-occupancy cell at NCLI.

71.     On June 27, 2017, Plaintiff Williams met with various individuals from NLCI to discuss accommodations for his disability.

72.     Defendants Fuchs and D. Huneke attended that meeting.

73.     On June 28, 2017, NLCI's Health Services Unit (HSU) Director, Candace Warner, sent Plaintiff Williams a letter summarizing the content of the prior day's meeting, copying Defendants Thomas, Fuchs, and D. Huneke. Director Warner also placed a copy of that letter in Plaintiff Williams' medical record at HSU.

74.     Director Warner's letter invited Williams to submit disability accommodation requests to NLCI's ADA coordinator for future consideration.

75.     On January 21, 2018—more than eighteen months ago—Plaintiff Williams wrote a letter to Defendant Thomas seeking his assistance in securing accommodation for various issues related to his disability, including being placed in a single-occupancy cell to protect the expensive equipment that he uses to read and write, specifically his video magnifiers.

76.     Plaintiff Williams explained to Defendant Thomas that his video magnifiers were the only way that he could read and write, and he implored Defendant Thomas to intervene and assist him in getting a single-occupancy cell to protect them.

77.     On March 25, 2018, Plaintiff Williams submitted a disability accommodation request seeking placement in a single-occupancy cell.

78.     As he had done in his prior letter to Defendant Thomas, Plaintiff Williams informed the ADA coordinator that he needed a single-occupancy cell to protect the expensive equipment that he uses to read and write, specifically his video magnifiers.

79.     He explained that the cramped nature of a dual-occupancy cell, as well as the inattentiveness of a cellmate to his video magnifiers, created a danger that his video magnifiers would be damaged and thereby rendered unavailable to provide the accommodation for which they are purposed.

80.     In response, on March 28, 2018, the ADA coordinator told Plaintiff Williams that his request was outside the scope of the ADA and directed him to address his concerns with his unit supervisor.

-14-

81.     On April 4, 2018, Plaintiff Williams met with an eye doctor at NLCI. Following that appointment, the eye doctor wrote in the Chronological Record of Eyecare Case Management that she was recommending that Plaintiff Williams be placed in a single-occupancy cell.

82.     Three weeks later, Plaintiff Williams met with Dr. Michael Repplinger at the UW Health Emergency Department in Madison, Wisconsin, to evaluate pain that he was having in his right eye.

83.     Dr. Repplinger thereafter ordered that Plaintiff Williams apply an ophthalmic ointment to his right eye at bedtime.

84.     Records from Plaintiff Williams' appointment with Dr. Repplinger were thereafter received and filed by NLCI's Health Services Unit on April 28, 2018.

85.     On May 2, 2018, a second note was entered in Plaintiff Williams' Chronological Record of Eyecare Case Management directing NLCI to consider placing him in a single-occupancy cell.

86.     Five days later, Plaintiff Williams wrote to Defendant Fuchs, NLCI's security director, requesting a single-occupancy cell, explaining that the eye ointment that he had been prescribed caused a security risk insofar as its medicinal application rendered him totally blind and made him vulnerable to his cellmate.

87.     On May 8, 2018, Defendant Fuchs denied Plaintiff Williams' request on the ground that other inmates with like concerns had not been given a single-occupancy cell.

88.     Plaintiff Williams filed an inmate complaint the following day, averring that the blindness resultant from his eye ointment rendered him vulnerable and unsafe

overnight; he explained his fear that he would suffer bodily harm or otherwise be taken advantage of while physically unable to defend himself.

89.     His complaint noted that he had twice spoken with an eye doctor at NLCI who had twice recommended—on April 4 and May 2, 2018—his being placed in a single-occupancy cell.

90.     Plaintiff Williams' complaint was later dismissed on the ground that he did not qualify for a single-occupancy cell for either medical or security reasons.

91.     Plaintiff Williams appealed denial of his complaint, explaining further how he and his equipment were endangered by his total blindness and the cramped nature of a dual-occupancy cell. He wrote that he was seeking a single-occupancy cell specifically to avoid any harm coming to him or his equipment.

92.     His appeal was dismissed, and on July 13, 2018, that dismissal was upheld by the DOC Secretary.

93.     On December 5, 2018, Plaintiff Williams had an appointment at NLCI with Dr. Pastryk, a non-staff eye doctor who provides medical care to NLCI inmates.

94.     At that appointment, Dr. Pastryk again recommended to Plaintiff Williams that he should be housed in a single-occupancy cell.

95.     Following that appointment, Dr. Pastryk specifically wrote in Plaintiff Williams' medical record that he should be placed in a single-occupancy cell.

96.     On February 7, 2019, Plaintiff Williams had an appointment with Dr. Nayan Patel of the UW Health University Station Ophthalmology Department.

97.     Following that appointment, Dr. Patel also noted in his report that a single-occupancy cell was requested to reduce the risk of trauma due to Plaintiff Williams' history of retinal detachment.

98.     Dr. Patel's reports were received by the NLCI HSU on February 11, 2019, and reviewed two days later by NCLI's medical staff, specifically Dr. Hoffman.

99.     On May 1, 2019, Defendant R. Huneke completed a Single Occupancy Cell Recommendation of Inmate form regarding Plaintiff Williams.

100.    In the space asking for the name of the person making the recommendation, Defendant R. Huneke wrote that she was doing it on behalf of Plaintiff Williams and Drs. Pastryk and Dr. Pater.

101.    When asked to indicate which situations served as justification for reviewing whether Plaintiff Williams should have a single-occupancy cell, Defendant R. Huneke checked the boxes for "Vulnerable Inmate," "Medical Needs," and "Other." In the provided space next to "Other," Defendant R. Huneke typed "patient is at risk of retinal detachment."

102.    When prompted to explain the reasons for having checked the above-stated boxes, Defendant R. Huneke wrote, "Williams reports he needs a single cell due to being vulnerable as a result of an eye condition. He is concerned that if he were assaulted he is at increased risk of a detached retina and therefore needs a single cell to mitigate this risk. He has spoken with and had both optical providers document the request as well."

103.    Defendant R. Huneke wrote nothing about the cramped nature of a dual-occupancy cell causing a hazard that could cause Plaintiff Williams to hit his head, resulting in retinal detachment.

104.    Defendant R. Huneke wrote nothing about the cramped nature of a dual-occupancy cell causing a hazard that could irreparably damage the electronic equipment on which Plaintiff Williams relies to read and write.

105.    Defendants D. Huneke, Peters, Fuchs, and R. Huneke served as the review team to decide whether to approve the Single Occupancy Cell Recommendation that R. Huneke had completed on Plaintiff Williams' behalf.

106.    Defendant Peters had, prior to serving on the review team, continually denied Plaintiff Williams' verbal requests to be place in a single-occupancy cell.

107.    Defendant Fuchs, prior to serving on the review team, had previously denied Plaintiff Williams' request for a single-occupancy cell.

108.    On the incomplete information provided by Defendant R. Huneke as to the basis for Plaintiff Williams' request for a single-occupancy cell, the review team concluded that Plaintiff Williams was not entitled to a single-occupancy cell.

109.    The review team did not address the risk of harm to Plaintiff Williams or his electronic equipment caused by the cramped nature of a dual-occupancy cell, instead focusing on the possibility of an assault by another inmate.

110.    The review team reasoned that "[t]here is risk inherent in incarceration and a single cell would not, in the team's assessment, mitigate this risk as an assault can happen anywhere. It is further noted that having a cellmate can be a protective factor in

many ways. Noting that Mr. Williams does have some level of vulnerability a pair with care will be added to WICS in order to help ensure that he is celled with an inmate with a low likelihood of violence. It should be noted that the step of allowing Mr. Williams to cell with someone he is comfortable with has already been taken and Mr. Williams has not noted any concerns in this regard."

111.    The review team did not write about the prior incidents in which Plaintiff Williams was celled with inmates having a history of physically assaulting their cellmates.

112.    The review team's recommendation against a single-occupancy cell was affirmed by the warden or the warden's designee.

113.    On May 7, 2019, Plaintiff Williams contacted Defendant R. Huneke to inquire how he could appeal the review teams' decision that he would not be given a single-occupancy cell.

114.    On May 13, 2019, Defendant R. Huneke informed Plaintiff Williams that there is not an appeal process to contest the decision.

115.    As of the date of this complaint, Plaintiff Williams remains house in a dual-occupancy cell at NLCI.

## LEGAL CLAIMS

### FIRST CAUSE OF ACTION

*Violation of the Americans with Disabilities Act by Wisconsin Dept. of Corrections*

116.    Defendant Wisconsin DOC is a public entity covered by Title II of the Americans with Disabilities Act. 42 U.S.C. § 12131(1); 28 C.F.R. § 35.104.

117.    Public entities are prohibited from denying "qualified individual[s] with a disability . . . the benefits of the services, programs, or activities of [the] public entity. 42 U.S.C. §12131.

118.    Plaintiff is a "qualified individual with a disability" pursuant to 42 U.S.C. §12131(2) because he meets the essential eligibility requirements for the receipt of services or participation in the programs and activities at NLCI. Defendant DOC has determined that he qualifies for incarceration at NLCI and has actually incarcerated him at NLCI.

119.    Plaintiff's near total blindness is a physical impairment that substantially limits his major life activity, pursuant to 42 U.S.C. §12102(2)(A), namely his ability to see.

120.    In providing aids, benefits, or services to incarcerated individuals with disabilities, Defendant DOC may not:

a.    Deny a qualified individual with a disability the opportunity to participate in or benefit from the aid, benefit or service;

b.    Afford a qualified individual with a disability an opportunity to participate in or benefit from the aid, benefit, or services that is not equal to that afforded others;

c.    Provide a qualified individual with a disability with an aid, benefit or services that is not as effective in affording equal opportunity to obtain the same result, to gain the same benefit, or reach the same level of achievement as that provided to others; or

d.    Otherwise limit a qualified individual with a disability in the enjoyment of any right, privilege, advantage, or opportunity enjoyed by others.

28 C.F.R. §35.130(b)(1)i, ii, iii & vii.

121.   As a Title II entity, Defendant DOC is required to reasonably accommodate the disability-related needs of individuals confined in its institutions pursuant to 28 CFR §36.130(b)(7).

122.   Plaintiff Williams' disability is so obvious that it is not necessary to notify either the individual Defendants or other correctional staff that he needs an accommodation. However, Plaintiff has repeatedly informed NLCI staff of his disability and need for accommodation. He has filed DOC-2530 Reasonable Accommodation/Modification Request forms, sent letters to NLCI staff, filed inmate complaints and litigated appeals from their denial, and recently sought to challenge the review teams' refusal to provide him a single-occupancy cell.

123.   Defendant DOC staff have already determined that Plaintiff requires his video magnifiers as ADA auxiliary aids and services to access NLCI services pursuant to 28 C.F.R. §§35.104 and 35.130(b)(1)iii & iv.

124.   The provision of those video magnifiers shows that DOC staff, including the individual Defendants, are on notice that Plaintiff Williams requires additional or different aid and services, or a reasonable accommodation to access NLCI services in compliance with the ADA.

125.   Transferring Plaintiff Williams to a single-occupancy cell would accommodate use of his video magnifiers free from the risk of damage or destruction caused by a dual-occupancy cell, as detailed above.

126. Additionally, transferring Plaintiff Williams to a single-occupancy cell without an upper bunk that also has an accessible toilet would reasonably avoid the risk of permanent loss of sight caused by his dual-occupancy cell, as detailed above, and would not impose an undue burden; the failure to do so is a denial of reasonable accommodation in violation of 28 CFR § 36.130(b)(7).

127. It is not necessary to demonstrate deliberate indifference to establish liability under the ADA and Rehab Act. *Washington v. Indiana High Sch. Athletic Ass'n, Inc.*, 181 F.3d 840, 846 (7th Cir. 1999); *Phipps v. Sheriff of Cook County*, 681 F. Supp. 2d 899, 917 (N.D. Ill. 2009).

128. Alternatively, Defendant DOC, through the actions of the individual Defendants, was and is deliberately indifferent to the substantial likelihood that Plaintiff Williams' current cell violates his rights under the ADA.

129. Plaintiff Williams is suffering irreparable harm and does not have an adequate remedy at law to address the ongoing violation of his legal rights. Ensuring that Wisconsin prisons provide appropriate aids, services and accommodations is in the public interest. The equities favor Plaintiff Williams.

130. Plaintiff is thus entitled to a declaratory judgment finding that the Defendants are violating his rights under the ADA.[1]

---

[1] Plaintiff would also have the same legal claims under § 504 of the Rehab Act – 29 U.S.C. § 794. The substantive provisions and protections of the two statutes are nearly identical and DOC does receive federal funding. The assertion of § 504 claims would add complexity and is not necessary because Plaintiff seeks only injunctive relief.

## SECOND CAUSE OF ACTION

### *Violation of Eighth Amendment by Individual Defendants*

131.    By engaging in the conduct set forth above, including but not limited to housing Plaintiff Williams in a dual-occupancy cell while acting with deliberate indifference to the known risk of permanent blindness to Plaintiff Williams that it creates, the Defendants Thomas, Fuchs, Peters, D. Huneke, and R. Huneke have violated Plaintiff's right to humane conditions of confinement as guaranteed by the Eighth Amendment of the United States Constitution and 42 U.S.C. § 1983.

132.    Plaintiff Williams admits that he has not yet suffered trauma to his head causing complete loss of vision by virtue of being double-celled.

133.    However, a prisoner is not required to await a tragic event prior to bringing a suit averring an Eighth Amendment violation for exposure to conditions of confinement that plainly prove unsafe. *Elling v. McKinney*, 509 U.S. 25, 33-34 (1993).

134.    The Eighth Amendment protects prisoners not only from deliberate indifference to a *current* serious health problem, but also from deliberate indifference to conditions posing an unreasonable risk of serious damage to *future* health. *Id.*

135.    In Plaintiff Williams' case, the individual Defendants are violating his Eighth Amendment rights by forcing him to be housed in a double-occupancy cell despite knowing that so doing poses a substantial risk that he will be permanently blinded.

136.    The unlawful conduct of Defendants Thomas, Fuchs, Peters, D. Huneke, and R. Huneke, as set forth above, was intentional and malicious or was wantonly committed in reckless or callous disregard of Plaintiff Williams' constitutional rights, and

he therefore seeks an award of punitive damages against the aforementioned defendants in order to deter them and others similarly situated from such wrongful conduct in the future.

## DEMAND FOR JURY TRIAL

137.    Plaintiff demands a trial by jury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Williams requests judgment against the Defendants as follows:

A.    A judgment declaring that the Defendants are violating Plaintiff Williams' rights under the ADA, the Rehab Act, and the Civil Rights Act by refusing to house him in a single-occupancy cell; and

B.    A judgment awarding Plaintiff Williams compensatory and punitive damages in the amounts deemed just by the Court, make-whole equitable relief, and the reasonable costs and expenses of this action including a reasonable attorney's fees and litigation costs, as well as such other and further relief as may be just.

Dated this 17th day of February, 2020.

PINIX & SOUKUP, LLC
Attorneys for Plaintiff David Williams

/s/ Matthew S. Pinix
Matthew S. Pinix, SBN 1064368
1200 East Capitol Drive, Suite 360
Milwaukee, Wisconsin 53211
T: 414.963.6164
F: 414.967.9169
matthew@pinixsoukup.com
www.pinixsoukup.com